# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CHRISTOPHER MICHAEL PATTERSON,

                              Petitioner,

    v.

BRIAN WILLIAMS, SR., *et al.*,

                             Respondents.

Case No. 2:20-cv-01267-GMN-NJK

**ORDER**

This habeas action is brought by Petitioner Christopher Michael Patterson under 22 U.S.C. § 2254. Respondents filed a Motion to Dismiss (ECF No. 73) Patterson's first amended petition for writ of habeas corpus (ECF No. 22) as untimely and, in the alternative, Ground 2 of the first amended petition as unexhausted. Also before the Court is Respondents' Motion to Seal (ECF No. 52). For the reasons discussed below, Respondents' motion to dismiss is granted and Respondents' motion to seal is granted.

## I.    Background

Patterson challenges a 2015 jury trial conviction and sentence imposed by the Eighth Judicial District Court for Clark County for one count of first degree kidnapping with use of a deadly weapon, one count of battery with intent to commit sexual assault, one count of coercion with use of a deadly weapon, two counts of sexual assault with a minor under sixteen years of age with use of a deadly weapon, one count of open or gross lewdness, and four counts of child abuse and neglect. (ECF No. 47-2.) On August 5, 2015, Patterson filed a motion for new trial, which the state court denied. (ECF Nos. 46-2, 46-9.) The state court sentenced Patterson to an aggregate sentence of 44 years to life. (ECF No. 47-2.)

On March 31, 2017, the Nevada Court of Appeals affirmed Patterson's conviction on direct appeal. (ECF No. 48-24.) On May 2, 2017, Patterson filed a motion for new trial. (ECF No. 48-27.) In addition, on April 17, 2017, Patterson filed a motion to dismiss counsel and to appoint new counsel. (ECF No. 48-25.) On May 11, 2017, the state court held a hearing on Patterson's motion

for new counsel and granted his request to dismiss counsel but did not appoint alternate counsel. (ECF No. 36-1.)  On May 16, 2017, the State filed an objection to fugitive document—Patterson's motion for new trial—arguing that the state court lacked jurisdiction based on a pending appeal and because Patterson was represented by counsel. (ECF No. 48-30.)

On May 24, 2017, the state court entered a minute order providing that the state court, "[h]aving examined Defendant's Motion for New Trial filed May 2, 2017, noted the motion was not served upon the District Attorney's office," and vacated the hearing on the matter. (ECF No. 36-1 at 84.)  The state court further held that "[s]hould the parties wish to proceed, the Hearing will need to be Re-Noticed and proof of service will need to be filed." (*Id*.)

On September 12, 2017, Patterson filed a motion for new trial. (ECF No. 49-3.)  Following a hearing, the state court denied Patterson's motion for new trial. (ECF No. 49-6.)  Patterson appealed and the Nevada Court of Appeals affirmed the denial of the motion for new trial as his "motion was not based on newly discovered evidence, the motion was filed more than two years after the jury's verdict, and the district court did not provide Patterson with further time to file a motion for new trial." (ECF No. 50-16 at 3.)

On December 19, 2018, Patterson filed a *pro se* state habeas petition seeking post-conviction relief. (ECF No. 50-21.)  The state court denied his petition as time-barred and specific claims as waived for failure to raise on direct appeal finding Patterson failed to establish good cause and prejudice to overcome the procedural bars. (ECF No. 51-1.)  On March 20, 2020, the Nevada Court of Appeals affirmed the denial as untimely and procedurally barred. (ECF No. 51-11.)  A remittitur issued on April 14, 2020. (ECF No. 51-12.)

On July 3, 2020, Patterson initiated this federal proceeding *pro se*. (ECF No. 1.)  The Court appointed counsel and granted Patterson leave to amend the petition. (ECF No. 11.)  On January 31, 2022, Patterson filed his first amended petition. (ECF No. 22.)  Respondents argue that the first amended petition should be dismissed as untimely.  In the alternative, Respondents argue that Ground 2 is unexhausted, and that Patterson improperly relied on evidence outside of the record. (ECF No. 73.)

///

## II.   Discussion

### a.   Patterson is not entitled to statutory tolling under § 2244(d)(2).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a one-year limitation period for state prisoners to file a federal habeas petition pursuant to 28 U.S.C. § 2254. The one-year limitation period, *i.e.*, 365 days, begins to run from the latest of four possible triggering dates, with the most common being the date on which the petitioner's judgment of conviction became final by either the conclusion of direct appellate review or the expiration of the time for seeking such review. *Id.* § 2244(d)(1)(A).

The AEDPA limitations period is tolled while a "properly filed" state postconviction proceeding or other collateral review is pending. 28 U.S.C. § 2244(d)(2). A "properly filed application" is one in which the "delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 1 (2000); *see also Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005) (an untimely petition is not "properly filed").

Here, Patterson's conviction became final after the Nevada Court of Appeals decided his direct appeal and the time expired for filing a petition for writ of certiorari with the Supreme Court of the United States on June 29, 2017. The AEDPA statute of limitations began running the following day. Absent another basis for tolling or delayed accrual, the AEDPA deadline expired 365 days later on July 2, 2018.[1]

Patterson's state petition was filed on December 19, 2018, and did not toll the federal deadline because the state petition was untimely and the state court denied his state petition as such. Because the state petition was not timely under Nevada law, it was not "properly filed" for the purposes of tolling the AEDPA deadline. *See Pace*, 544 U.S. at 417. Without another basis for tolling or delayed accrual, the AEDPA deadline expired on July 2, 2018, and Patterson's federal petition was filed two years later on July 3, 2020. Patterson's first amended petition was filed on January 31, 2022.

Petitioner, however, argues he is entitled to statutory tolling under 28 U.S.C. § 2244(d)(2)

---

[1] Because the 365th day fell on the weekend, June 30, 2018—Petitioner had until the following Monday, July 2, 2018, to file his federal petition.

because the state court did not issue "any formal written orders" resolving his May 2, 2017 motion for new trial. (ECF No. 80 at 6.)   He asserts that because the May 2, 2017 motion remains "overlooked and pending to this day," he is entitled to statutory tolling from May 2, 2017 to now and continuing forward. (*Id.*)

The Court does not agree that Patterson's May 2, 2017 motion for new trial was "overlooked" by the state court.   On May 24, 2017, the state court determined that Patterson's motion was not properly served on the District Attorney's office, vacated the motion hearing, and instructed that Petitioner had to file proof of service to proceed. (ECF No. 36-1 at 84.)   A plain reading of the state court's minute order provides that the state court denied Patterson's motion for new trial without prejudice on May 24, 2017.   Accordingly, the Court finds that Patterson is not entitled to statutory tolling on the basis that his May 2, 2017 motion for new trial is still pending before the state court.

Patterson's September 12, 2017 motion for new trial was untimely as determined by the state court and Nevada Court of Appeals and thus it was not properly filed for the purposes of statutory tolling pursuant to § 2244(d)(2).   *Pace*, 544 U.S. at 417.   Accordingly, the Court finds that Patterson's initial and first amended habeas petitions were untimely filed and Patterson is not entitled to statutory tolling.

**b.  Patterson's Actual Innocence Claim**

A convincing showing of actual innocence may enable habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. *Schlup v. Delo*, 513 U.S. 298, 314–16 (1995).   "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar [or] expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (citation omitted).   "[I]f a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316.   However, the Supreme Court has cautioned that "tenable actual-innocence gateway pleas are rare. *McQuiggin,* 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329);

*House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met).

To demonstrate actual innocence, "a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt'." *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002) (quoting *Schlup*, 513 U.S. at 316).  Put another way, "actual innocence" is established when, in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup*, 513 U.S. at 327-28).  The petitioner must establish factual innocence of the crime, and not mere legal insufficiency. *Id.*; *Jaramillo v. Stewart*, 340 F.3d 877, 882-83 (9th Cir. 2003).  To demonstrate actual innocence to overcome a procedural bar under *McQuiggin* and *Schlup*, a petitioner must present "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

Patterson argues that his demonstration of actual innocence overcomes Respondents' argument that his first amended petition should be dismissed as untimely.  He asserts that the State presented a weak case against Patterson at trial because the three primary trial witnesses provided substantially inconsistent testimony regarding material details and C.K., a victim witness, presented testimony that differed from her reports to the police. (ECF No. 80 at 8-13.)  He further asserts that the state court excluded key pieces of evidence that (1) C.K. previously made a false sexual abuse allegation against another person, and (2) text messages between C.K. and her mother.

### i.  Relevant Trial Evidence

On the night of January 1, 2011, Patterson's 13-year-old daughter, B.R., had a sleepover at Patterson's residence where Patterson's girlfriend Elizabeth's 15-year-old daughter, C.K., and Patterson's 17-year-old cousin, I.S., were also present.  At opening argument, the State presented its theory of the case that on January 1, 2011, after playing an alcoholic drinking game with B.R., C.K., and I.S., Patterson sexually assaulted C.K. and physically assaulted B.R. (ECF No. 42-1 at

95.) Patterson also gave B.R. alcohol on a regular basis and had B.R. assist him in selling drugs. (*Id*. at 111-12.)

### 1.  C.K.'s Testimony

At trial, the State called C.K.to testify and she testified that her mother, Elizabeth, previously dated Patterson and she had met him ten or less times during the time that they dated. (ECF No. 42-1 at 119, 125.)  C.K. testified that Patterson along with B.R. and I.S. picked her up to spend time at his apartment with B.R. (*Id*. at 127.)  After picking her up, they went to Wal-Mart to buy food. (*Id*. at 130.)  After eating pizza and salad, Patterson brought out two types of alcohol, vodka and hypnotiq, as well as shot glasses and stated that they were going to celebrate the new year and play a drinking game with cards. (*Id*. at 136-37.)

C.K. further testified that she observed I.S. throwing up. (*Id*. at 139.)  C.K. also got sick and threw up. (*Id*. at 140.)  She testified that she had maybe just one shot or a sip of hypnotiq mixed with vodka. (*Id*.)  She further testified that her drink tasted different and that it made her dizzy. (*Id*. at 142.)  C.K. then laid down in the bedroom that B.R. typically slept in when she stayed at Patterson's two-bedroom apartment. (*Id*. at 145.)

C.K. testified that she woke up in Patterson's bedroom, Patterson was on top of her, and she did not have her underwear or shorts on. (*Id*. at 146, 150.)  Her arms were tied behind her back and Patterson's penis was inserted in her vagina. (*Id*. at 147.)  C.K. testified that she heard knocking on the door and the doorknob rattling and Patterson put his hand over her mouth. (*Id*. at 149.)  Patterson told C.K. that if she ever spoke about this that he would kill her with his gun and Patterson grabbed the handgun that was above her head and placed to the side of her face. (*Id*.)  C.K. testified that she struggled with Patterson and yelled for help. (*Id*. at 153-54.)

C.K. got free, went to B.R.'s bedroom, and told B.R. that Patterson raped her. (*Id*. at 155.)  C.K. called her mother using I.S.'s phone and asked her mother to pick her up. (*Id*. at 158.)  Elizabeth picks up C.K. with an individual C.K refers to as her aunt and C.K. tells them that she was raped. (*Id*. at 163.)  C.K. did not notify the police because her mother instructed her not to because her mother was concerned about an open case with child protective services. (*Id*. at 164.)  C.K. told police officers that she was raped after officers responded to her residence for a separate

incident involving her stepfather.

On cross-examination, the defense questioned C.K. about inconsistencies between her testimony and what she initially reported to police. (ECF No. 42-1 at 196-247.)

### 2. B.R.'s Testimony

At trial, the State called B.R. to testify and she testified that she would spend weekends with Patterson. (ECF No. 43-1 at 16.)  She testified that after they ate pizza and salad, C.K. drank a beer on the couch. (*Id*. at 31.)  They played a drinking game. (*Id*.)  B.R. testified that she did not enjoy drinking, but Patterson provided alcohol to her a couple of times a month. (*Id*. at 34.)  She further testified that Patterson first forced her to drink alcohol when she was 10 or 11 years old. (*Id*. at 35-36.)

B.R. testified that everybody took shots, that C.K. took "a little bit less," and that B.R. took "way less." (*Id*. at 37.)  According to B.R., C.K. began to throw up first, C.K. went to the bathroom, and returned to the living room. (*Id*.)  I.S. began to throw up and they put her in the bathtub. (*Id*. at 38.)  B.R. cleaned up the throw up while C.K. was on the couch. (*Id*. at 39.)  Patterson instructed B.R. to put C.K. in his bedroom. (*Id*.)  B.R. testified that she did not understand why Patterson wanted to put C.K. in his bedroom, but B.R. put C.K. in his bed under the covers.

B.R. testified that Patterson took a shower in the bathroom connected to his bedroom. (*Id*. at 41-42.)  B.R. heard the shower stop and observed Patterson at the foot of the bed pulling C.K. towards him. (*Id*. at 43.)  B.R. walked into his room, asked him what he was doing, then Patterson pushed B.R., and they started tugging the door back and forth between them. (*Id*.)  Patterson closed the door and locked it. (*Id*. at 44.)  B.R. tried to open the door and was banging on it. (*Id*.)  She testified that she heard C.K. screaming, "stop" and "no." (*Id*.)

B.R. then tried to call her mother and grandmother. (*Id*. at 45.)  B.R. asked her grandmother to pick her up and told her grandmother that she was scared. (*Id*.)  B.R. did not know Patterson's address but described surrounding landmarks to her grandmother. (*Id*. at 46.)  B.R. then left the apartment for a nearby bus stop. (*Id*.)  B.R. waited at the bus stop for five minutes when Patterson appears with a belt and begins hitting B.R. on her arms, neck, and back with the belt. (*Id*. at 49-51.)  After returning to the apartment, B.R. entered her bedroom and Patterson continued to hit

her. (*Id*. 51-52.)  B.R. testified that C.K. entered her bedroom and informed B.R. that Patterson raped her. (*Id*. at 52.)

Patterson dropped B.R. off at her grandmother's house the next day. (*Id*. at 58.)  After showing her mother and grandmother her bruises and marks from being hit, they called the police. (*Id*. at 59.) B.R. recounted the event to the police, but she did not know C.K.'s last name. (*Id*. at 62-63.) B.R. further testified that Patterson had B.R. deliver drugs for him. (*Id*. at 66.) She testified that she had seen Patterson with a gun. (*Id*. at 72.)

On cross-examination, the defense questioned B.R. about the custody litigation that was ongoing between B.R.'s mother and Patterson. (*Id*. at 78.)  The defense also elicited testimony that B.R. took six shots that "weren't filled" and that C.K. took eight to ten shots of alcohol and beer. (*Id*. at 83.)

### 3.  Elizabeth's Testimony

The State called C.K.'s mother, Elizabeth, to testify at trial and she testified that on that night C.K. called her crying asking to be picked up from Patterson's apartment. (ECF No. 43-1 at 128.)  C.K. instructed Elizabeth to wait in the parking lot. (*Id*. at 130.)  She further testified that C.K. came out, could barely walk, was shaking, and reeked of alcohol. (*Id*.)  C.K. told Elizabeth that she was raped, but they didn't take C.K. to the hospital or call the police because Elizabeth "didn't want [her] child taken away from [her.]" (*Id*. at 132.)  Elizabeth testified that she had an open case with child protective services ("CPS"). (*Id*.)

Elizabeth continued to communicate with Patterson. (*Id*. at 139.) On January 5, 2011, Patterson picked up Elizabeth and she called CPS and left a voicemail that provided that Patterson did not rape C.K. and that C.K. had only actually drank pineapple juice. (*Id*. at 141.)  She testified that she called CPS at the direction of Patterson. (*Id*. at 142.)  Patterson also recorded multiple videos of Elizabeth after drinking alcohol while at his apartment "[t]o let his attorney know that the currents with – between him and my child did not happen." (*Id*. at 144.)  Elizabeth testified that Patterson told her what to say in the videos. (*Id*. at 145.)  Elizabeth also wrote a reference letter for Patterson and testified that he would not let her leave his apartment until she wrote the letter and recorded the videos. (*Id*.)  She testified that she regretted going to his apartment. (*Id*. at

147.)

### 4.   I.S.'s Testimony

At trial, the State called I.S. to testify.  She testified that she was close to Patterson and that she stayed with him on and off since she was six years old. (ECF No. 44-1 at 98.)  Patterson left his apartment to pay a phone bill and I.S. went to take a shower. (*Id*. at 103.)  She testified that after her shower, she caught B.R. and C.K. opening bottles of Hennessy and drinking the alcohol. (*Id*.)  She testified that they played the drinking game and that she had about seven shots. (*Id*. at 105.)  According to I.S., B.R. had two shots and C.K. had one shot. (*Id*. at 108.)  I.S. also testified that C.K. argued with Patterson because C.K. used his laptop and C.K.'s mother restricted C.K.'s use of the internet. (*Id*. at 128.)  I.S. testified that C.K. and Patterson also argued about whether Patterson was the father of C.K.'s mother's deceased baby that recently died and Patterson did not attend the funeral. (*Id*.)

I.S. testified that she threw up on the table. (*Id*. at 109.)  She woke up in the bathtub, put her clothes on, and went to B.R.'s bedroom. (*Id*. at 113-14.)  She testified that while she was in B.R.'s room with B.R. and C.K, C.K. told her that Patterson raped her. (*Id*. at 115.)

### ii.   Newly Presented Evidence

### 1.   C.K.'s Previous Allegations

Patterson argues that the state court improperly excluded evidence that C.K. previously made a false sexual abuse allegation while living in Hawaii. (ECF No. 80 at 14.)  Elizabeth told police in September 2011 that C.K. had a history of making false sexual abuse allegations. (ECF No. 23-2.)  Elizabeth testified at a pretrial hearing that C.K. had alleged that a cousin sexually abused her, but then C.K. recanted and told Elizabeth that the encounter was consensual. (ECF No. 37-26.)  C.K. also testified at the pretrial hearing but testified that the allegation in Hawaii was true and denied recanting the allegation. (*Id*.)

Patterson asserts that the jury would have found reasonable doubt about the allegations against Patterson on the basis of C.K.'s previous allegation even though C.K. insisted the allegation in Hawaii was true. (ECF No. 80 at 15.)  Patterson further argues that the defense elicited testimony from a CPS investigator that C.K. had recanted her allegations against Patterson, but

C.K. and B.R. disagreed and insisted that the recantation did not take place. (*Id*.)  On that basis, Patterson contends that the jury could have concluded that C.K. was again falsely denying a recantation regarding her allegations against Patterson. (*Id*.)

### 2.  Text Messages between C.K. and Elizabeth

At trial, the State successfully objected to the presentation of text messages between C.K. and Elizabeth during the sleepover because the defense did not first question C.K. about the text messages. (ECF No. 44-1.)  C.K. sent a series of text messages to Elizabeth asking Elizabeth to pick her up because C.K. was bored. (ECF No. 80 at 15.)  Elizabeth ignored C.K.'s request.  C.K. then texted Elizabeth that she had been raped prompting Elizabeth to pick C.K. up. (*Id*.)  Patterson argues that the jury could have concluded that C.K. had a motive to make false allegations because Elizabeth would not pick up C.K. until she made a serious claim. (*Id*. at 16.)

### 3.  Patterson fails to meet the demanding *Schlup* standard.

The newly presented evidence does not demonstrate that it is more likely than not that no reasonable juror would have found Patterson guilty beyond a reasonable doubt.  Patterson attempts to further discredit C.K. based on C.K.'s previous sexual abuse allegations that the state court excluded at trial on the basis that Patterson failed to meet his burden of showing that the previous accusations were false. (ECF No. 37-6 at 35.)  The jury, however, heard testimony at trial from Elizabeth that she had informed CPS and provided statements that Patterson did not rape C.K.  At closing, the defense highlighted the inconsistencies in C.K.'s testimony and highlighted the CPS investigator's testimony that C.K. "said she got raped but then she said she made it up." (ECF No. 45-3.)  The defense also highlighted testimony that C.K. was intoxicated on the night the event took place even though C.K. testified that she only had one shot. (*Id*.)  Although Patterson's new evidence could have further discredited C.K., the jury could have continued to believe the State's theory of the case based on the evidence presented at trial.

Patterson further argues that text messages between C.K. and Elizabeth could have led a jury to conclude that C.K. made false allegations against Patterson to prompt her mother to pick her up early from the sleepover because she was bored.  The defense elicited testimony from I.S. that C.K. and Patterson engaged in an argument and that C.K. was angry at Patterson. (ECF No.

44-1 at 128.)   The text messages between C.K. and Elizabeth are of minimal probative value regarding a potential motive for C.K. to make false allegations against Patterson considering the evidence already presented at trial.

The Court is not persuaded that the presentation of C.K.'s previous allegations and text messages between C.K. and Elizabeth demonstrates evidence so strong as to undermine confidence in the jury's verdict.   None of the materials demonstrate Patterson's actual innocence.   By determining that Patterson fails to meet the demanding *Schlup* standard, the Court finds that Patterson has not made a viable claim that actual innocence allows him to bypass AEDPA's statute of limitations and the Court grants Respondents' motion to dismiss.

### III.   Motion to Seal

Respondents seek leave to file under seal Exhibit 94, Petitioner's Presentence Investigation Report ("PSI") (ECF No. 53-1), dated September 10, 2015.   Under Nevada law, the PSI is "confidential and must not be made a part of any public record."   Nev. Rev. Stat. § 176.156(5).

Having reviewed and considered the matter in accordance with *Kamakana v. City and County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006), and its progeny, the Court finds that a compelling need to protect Petitioner's safety, privacy, and/or personal identifying information outweighs the public interest in open access to court records.   The Court grants Respondents' motion for leave to file exhibit under seal.

### IV.   Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability ("COA").   Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."   With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. *Id.*   To meet the threshold inquiry, a petitioner has the burden of

demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *See Allen v. Ornoski*, 435 F.3d 946, 950-51 (9th Cir. 2006).

Applying these standards, this Court finds that a certificate of appealability is unwarranted.

## V.   Conclusion

**IT IS THEREFORE ORDERED:**

1. Respondents' Motion to Dismiss (ECF No. 73) is GRANTED.  Petitioner's first amended petition for writ of habeas corpus (ECF No. 22) is dismissed with prejudice as untimely.  The Clerk of Court shall enter judgment accordingly and close this case.

2. Respondents' Motion to Seal (ECF No. 52) is GRANTED.

DATED:  March 29, 2023

_____
GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE